**AMERICAN SAMOA, Plaintiff**

v.

**MRS. L. J. WILLIS, Defendant**

No. 1-1911

High Court of American Samoa

Criminal Jurisdiction, Appellate Division

June 20, 1911

H. W. CROSE, Commander, U.S.N., Commandant Naval Station, *President of the High Court*

The defendant was tried and convicted in the High Court of Tutuila, of the charge of assault and battery upon one McDonald. Over defendant's motion for a new trial and in arrest of judgment the defendant was sentenced to serve a term of imprisonment of six months. The defendant prays an appeal, and upon furnishing approved bond is admitted to bail.

The questions are here presented by a Petition for Review, assigning as error the overruling of defendant's motion for a new trial and in arrest of judgment, respectively.

The first question discussed in defendant's petition is, that the Court is without jurisdiction. It is contended that the defendant, although tried for an infamous offense, was not tried on an indictment returned by a grand jury, as provided by Article V. of the Amendments to the Constitution of the United States, and was not granted a trial by jury as provided for by Article VI. of said Amendment; that therefore the court was without jurisdiction.

It will be of interest to note the steps leading to the establishment of the present form of government for the United States Naval Station, Tutuila.

By a treaty between the United States, Germany and Great Britain, signed December 2, 1899, proclaimed February 16, 1900, the Islands of Tutuila of the Samoan Group, and all other Islands of the Group east of Longitude 171° west of Greenwich came under the control of the United States, by Germany and Great Britain renouncing in favor of the United States their rights and claims over said islands.

On February 19, 1900, the President of the United States issued the following order:

"Executive Mansion,

Washington, D.C., February 19, 1900.

The Island of Tutuila of the Samoan Group, and all other Islands of the Group east of Longitude 171° west of Greenwich, are hereby placed under the control of the Department of the Navy, for a Naval Station.

The Secretary of the Navy will take such steps as may be necessary to establish the authority of the United States, and to give the islands the necessary protection.

(Signed) William McKinley."

The Secretary of the Navy on the same date issued an order as follows:

"The Island of Tutuila of the Samoan Group, and all other Islands of the Group east of Longitude 171° west of Greenwich, are hereby established into a Naval Station, to be known as the Naval Station, Tutuila, and to be under the command of a Commandant."

B. F. Tilley, Commander, U.S. Navy, was the first Commandant ordered to command this Naval Station. His orders contained the following clause:

"While your position as Commandant will invest you with authority over the islands in the Group embraced within the limits of the Station, you will at all times exercise care to conciliate and cultivate friendly relations with the natives."

This same clause occurs in the orders of successive Commandants to the present day.

The first Commandant drew up a Form of Government by "Regulations". Regulation No. 5 of May 1st, 1900 is "A Declaration Concerning the form of Government for the United States Naval Station, Tutuila". This Regulation describes the form of Government and judicial administration, and is still in force, with amendments.

The Commandant, after drawing up the foregoing regulation asked the approval of the Navy Department, and received the following reply, dated June 12, 1900:

"As regards the government that it is proposed by you to establish for the Islands, the Department deems it necessary to remark that any approval of your procedure must be made only after a very careful and thorough consideration here. The process of organizing and developing a settled form of Government in these Islands must of necessity be a slow one. *There is little occasion for the forms and ceremonies of a complete organization at first.* You appear to be adopting a salutary mode of keeping along matters as you find them, unless urgent reasons appear to the contrary." (Navy Department to Commandant, June 12 ,1900.) (Italics are mine.)

The decision of the Department not to formally approve regulations issued by the Commandant was reiterated by the Department in a letter to Commandant of September 2, 1902. In this letter the Department states that the Commandant is authorized to make such changes in the Station Regulations as his judgment commends. (See also letter, Department to Commandant of September 15, 1902.)

On April 17, 1900, the Chiefs of Tutuila ceded their Island to the United States, and on June 5, 1903, the Chiefs of Manua did likewise. These cessions were never accepted by Congress, but were accepted by the President of the United States.

In the year 1903, a Bill was introduced in the United States Senate for a Constitution for Tutuila, but no action was taken. (The text of this Bill is not on this Station.)

On October 11, 1900, the State Department informed the United States Consul General in Apia, Samoa, as follows:

"Tutuila, which is a Naval Station belonging to the United States, is not a 'port or place' in the United States within the meaning of the Act of Congress approved February 15, 1893." (Distressed American Seamen.) Letter, Department to Commandant, August 20, 1901.

In a letter from the Department to the Commandant of September 25, 1901, is the following:

"In reply I have to state that in the application of Art. 499 and 893, par. 4, of the Regulations (Naval) to which you specifically refer, Tutuila is to be regarded as a foreign port, inasmuch as the laws and treaties of the United States give to this country only certain limited rights in the Samoan Islands, and do not, so far as the above named articles of the Regulations are concerned, bring the Station under your command in the category of ports of the United States." (The above refers to distressed American Seamen.)

In a letter from the Department to the Commandant of December 2, 1901, occurs the following clause:

"You are informed that the occupancy of Tutuila is quite distant from the sovereignty exercised at Porto Rico, Hawaii and Guam." (In reference to expenditure of money for roads outside of Naval Station proper.)

In a letter of October 9, 1901, from Secretary of Treasury to Secretary of State, occurs the following:

"I have to acknowledge the receipt of your letter of the 2d inst., enclosing a copy of a dispatch from United States Counsul at Auckland, requesting instructions as to whether consular invoices are required for merchandise shipped from the port of Tutuila, Pago Pago, Samoa. In reply I have to state that while Tutuila is held to be within the jurisdiction of the United States for certain purposes, yet the tariff laws have never been extended to it and, therefore, the production of consular invoices pursuant to such laws cannot properly be required." (Letter, Secretary of the Navy to Commandant, May 3, 1902.)

On March 4, 1902, the Department in a letter to the Commandant, concerning rates of customs, states:

"I have to inform you that the State Department, the Department of Justice and the Treasury Department now hold that Tutuila is not foreign but domestic territory. The Supreme Court, in the so called 'insular cases,' has held that without an act of Congress no custom duties can be imposed upon goods coming from our insular domestic territory to the United States, but the court has sustained an Act of Congress imposing such duties. The gist of those decisions, as I understand it, is that the President or a Department cannot impose a tax on goods shipped from such insular possessions to the

United States or conversely, but that an Act of Congress imposing such duties will be sustained. I am inclined to the opinion that now or later it will be necessary to abandon taxation or duties upon goods shipped from the United States, or its domestic territory to Tutuila."

A letter from the Attorney General to Secretary of Treasury, February 17, 1902, is enclosed in above letter from which the following extract is taken:

"Department Justice, Washington, D.C.

February 17, 1902.

to Treasury Department.

By recent events, including the making and executing of a treaty between Great Britain, Germany and the United States, the island of Tutuila, of which Pago Pago is a port, has come under the control and into the possession of the United States. It is a small island with but three or four thousand inhabitants, has been separated politically from the remainder of the Samoan group, the authority of the King of Samoa over it is at an end, and it has no government but that of a naval officer appointed by the United States authority, except local town governments. By the treaty referred to, the exclusive sovereignty of the United States over it appears to be asserted by us and recognized by Great Britain and Germany, which nations formerly shared with us a protectorate.

I find that on December 6, 1900, the Department of State, whose opinion is entitled to great weight in interpreting the effect of its own negotiations and proceedings in such a case, expressed the view that Pago Pago is not a 'foreign port or place' within the meaning of the law imposing a tonnage tax upon vessels. And on December 8, 1900, two days later, your own Department (Treasury Decision 22661) ruled that such a tax was not collectible upon a vessel from Pago Pago. Among the enclosures of your letter to me is one from the Secretary of State, advising you that 'the islands of Tutuila and Manua, being in the exclusive possession and control of the United States, should be considered as domestic territory in the sense in which and to the extent that Porto Rico was so, immediately before the passage of the statute providing a government therefor.' In view of these things I am of the opinion that our tariff laws, imposing duties upon goods from 'foreign countries,' are not applicable to goods arriving from Pago Pago."

In a letter of May 18, 1903, from Navy Department to Commandant, *in re* registering of schooner "Ettie White" owned by Natives of Manua, occurs the following, quoted from Judge Advocate General of the Navy:

"It is true that the authorities on this point refer to vessels owned by American Citizens; but they spoke at a time when no other class of persons likely to own sea-going vessels existed within the national boundaries. It does not seem necessary in dealing with this question to decide whether or not native Samoans are citizens. That they owe allegiance to the flag is sufficiently clear; that they have the legal right to purchase and own sea-going vessels is undoubted. The *'Ettie White'* having been lawfully purchased by persons of this class, becomes a piece of property in American ownership, and as such, is entitled to the protection of the National flag. She has no right to fly any other. If challenged by an armed vessel on the high seas, she would have the right to display the national ensign, and if fired upon and destroyed, her owners, as Americans, whether Citizens or not, would have the right to look to the general government to which they owed allegiance for protection and redress."

All of the above quotations from letters show the development of opinion as to the status of the Islands of Tutuila and Manua, which status has never been fixed by act of Congress. It is shown that such laws as are in force result from a form of military government under authority of the President. The islands are a "Naval Station" and have therefore a different status from territory under a civil form of government.

In a very interesting book, entitled "The Law of Civil Government in Territory Subject to Military Occupation by the Military Forces of the United States," by Charles E. Magoon, Law Officer, Bureau Insular Affairs, War Department, may be found an exhaustive report of various cases of military occupation, many of which are applicable to Tutuila. Quotations follow:

p. 28. "An officer of the United States acting as a military governor is bound to obey the orders of his superior officers, and to conform to

such rules, regulations, orders, and instructions as the home Government is authorized to make, either by virtue of its own laws and principles of government or by the general law of nations."

p. 30. "It is also important to ascertain if the head of the military government of Porto Rico may exercise the powers of the judicial branch of the government. The functions performed by the judiciary are essential to good government, and therefore must be performed in Porto Rico. The jurisdiction to exercise judicial authority in territory to which the sovereignty of the United States has attached differs from that of legislation, in that the jurisdiction to legislate is conferred upon Congress by the fact of the sovereignty attaching, while the Federal courts of the United States, being dependent upon Congress for their territorial and other jurisdiction, must await appropriate action by Congress for jurisdiction over newly acquired territory. Meanwhile the necessity for judicial action continues, and the military government is called upon to meet the necessity. Article XII of the treaty of peace (1898) clearly contemplates that the ordinary courts of the prior government will continue in existence, and such is the usage of nations. If these courts are found inadequate to deal with the domestic or internal situation arising by reason of the questions involved in the relations sustained by the inhabitants of the island, *inter se,* I am of opinion that the head of the military government of the island would be authorized to discharge the necessary functions, and to accomplish said purpose may designate instruments therefor, to wit, courts. As shown by the decision of the Supreme Court of the United States, these courts in Porto Rico could not be authorized by the President to pass upon rights possessed by the United States, nor could they be given jurisdiction in admiralty matters. Their powers must be confined to internal and domestic matters, such as are controlled by the laws regulating the personal relations which the inhabitants sustain to each other as individual members of society."

pp. 45–47. Here is an explanation of the cession to the United States by Spain of Porto Rico, Guam and the Philippines including the provisions that "the civil rights and political status of the territories ceded to the United States shall be determined by Congress." In that case Congress accepted the cession and legislated for the islands. Herein lies a great difference in the status of Tutuila.

p. 54. "The important matter to be now determined is, shall *the boundaries of the United States be extended to include any or all of the islands of Porto Rico, Philippine Archipelago and Guam? The*

*determination must be made by Congress and approved by the executive."* (Italics are mine.)

p. 57. In the case of *In re Ross,* 140 U.S. 453 "The holding of the (Supreme) Court as stated in the syllabus is as follows:

By the Constitution of the United States a government is ordained and established 'for the United States of America,' and not for countries outside of their limits; and that Constitution can have no operation in another country.

The laws passed by Congress to carry into effect the provisions of the treaties granting extraterritorial rights in Japan, China, etc. (Rev. Stats. Secs. 4083–4096), do no violation to the provisions of the Constitution of the United States, although they do not require an indictment by a grand jury to be found before the accused can be called upon to answer for the crime of murder committed in those countries or to secure to him a jury on his trial." "The deck of a private American vessel, it is true, is considered for many purposes as constructively territory of the United States, yet persons on board such vessels, whether officers, sailors or passengers, cannot invoke the protection of the provisions referred to until brought within the actual territorial boundaries of the United States, And besides, *their enforcement* abroad in numerous places, where it would be highly important to have consuls invested with judicial authority, *would be impracticable, from the impossibility of obtaining a competent grand or petit jury. The requirement of such a body to accuse and to try an offender would, in a majority of cases, cause an abandonment of all prosecution."* (Italics are mine.)

p. 60. "Although Congress has legislated as to how and by what means the rights secured by the United States in the Samoan Islands are to be exercised, it has never been claimed that the boundaries of the United States had been extended to include any of the Territory constituting the Samoan Islands. The reason for this is that neither by direct legislation or necessary intendment has Congress ever manifested its assent to such extension." (This refers to a time antecedent to the present government in Tutuila. There has been no legislation by Congress as to how the rights, etc., may be exercised.)

p. 63. "Art. IV Section 3, of the Constitution provides that—

The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States. The decisions of the courts uniformly sustain the doctrine that by this provision of the Constitution Con-

644

gress is given the power to govern those portions of the public domain lying outside of the boundaries of the several States of the Union, in the manner and by the means which to Congress seem best adapted to existing conditions, ranging from a joint protectorate, such as is exercised over Samoa, to a Territorial government of well-nigh sovereign power, such as exists in Oklahoma."

p. 65. "If these islands and their inhabitants, Porto Rico, Guam and the Philippines), are without the aegis of the Constitution, what then is their protection from an oppressive government and unjust laws? The answer is plain. Such protection is found in the character and enlightenment of the new sovereign within whose jurisdiction they now are, to wit, the sovereign people of the United States. They are a charge upon the conscience of that sovereign, and the 'inalienable rights' of a people are safe in that custody even when not guaranteed by the letter of the Constitution, for they are protected by laws higher than the Constitution, being the laws of American civilization, the moral sentiment of the nation pervading all our institutions and from which even the Constitution derives its force."

p. 89. "It therefore seems incontrovertible that the unorganized territory of the United States is not bound and benefited by the Constitution and laws of the United States until Congress has made appropriate provision therefor. And if Congress shall by appropriate action extend the territorial boundaries of the United States to include the islands acquired by the nation during the late war with Spain, and thereafter continue said islands in the condition of unorganized territory governed by the sovereign powers of the nation, the exercise of said sovereign powers will not be directed, limited, or controlled by the expressed provisions of the Constitution."

p. 110. "Trial by jury, in the abstract, is not a right, but a means of securing a right. The right involved is justice.

Justice is an inherent, inalienable right of man, which no sovereign may properly refuse. Trial by jury is one of the fixed institutions of the common law, and where the common law prevails, this procedure may be said to attain the dignity of a right. That is to say, it is so ingrafted on the common law as to be an essential part thereof. But this is not true of the *civil law*. The common law belongs to the Anglo-Saxon race. It is the creature of their civilization. Centuries of adherence and devotion to its teachings has given it the character of righteousness, if not of right.

The guaranty of trial by jury dates back to Magna Charta, and with an Anglo Saxon, no right need seek other source for its vindi-

cation. But the Latin races can assert no such title. Whence their claim to the rights secured on Runnymede and guaranteed by the Magna Charta? Their adherence and devotion has been given to the civil law. *If the manifest result of attempting to administer justice by jury trials would be to defeat the purpose and deny the right of justice is the sovereignty which is bound to sustain the right to justice bound to rely on trial by jury. Must the substance be sacrificed to preserve the shadow?"* (Italics are mine.)

p. 120. "The doctrine discussed in the foregoing report—that Congress in legislating for territory outside of the boundaries of the several states of the Union is not bound by the limitations imposed by the Constitution—was approved by the Secretary of War Department, and received the sanction of the legislative department by the enactment of the Foraker Act, providing a civil government for Porto Rico (31 Stat. L., 77) which act was approved by the President and sustained by the Supreme Court in the insular cases (182 U.S. 1-498)."

▉ I am of the opinion that the provisions of Articles V and VI of the Amendments to the Constitution of the United States as to the right to be tried on an indictment returned by grand jury, and by a jury of his peers, do not apply to the Naval Station, Tutuila. It is clear that the form of government of this Station was established by a duly authorized person, and that the form so established is well suited to the locality. The Islands of Tutuila and Manua have a population of about 6,000 natives and a few whites and half castes. There are very few who could be called upon for jury duty, among the whites, as the majority of them are not Citizens of the United States or of Tutuila. The natives are uncivilized and are incapable of self-government. Justice could not be administered according to the form in the United States, and the institution of the system of grand and petit juries would not be practicable.

In 1899 a Commission was sent to Samoa by the three powers America, England and Germany to take charge of the civil government and to make recommendations to the

powers for the permanent government of Samoa, it having been found that the government under the treaty of 1889 was insufficient. The American member of this Commission was Mr. Bartlett Tripp. I quote the following from the final report of Mr. Tripp to Secretary of State found in Government Publication "Treaties, Conventions, and State Papers relating to the Acquisition of the Samoan Islands," at page 100.

"Much complaint existed also among American and English settlers especially, that the Berlin act contained no provision for a trial by jury, which citizens of those nations regard as one of their dearest rights. We found, however, that it would be quite impracticable to provide for a jury of twelve men, where perhaps not one hundred men qualified for jury duty, could be found on the entire islands, and we therefore have compromised the matter by providing for a jury of three to be allowed in the discretion of the court in civil cases and as an absolute right in criminal cases. This in lieu of the provision for assessors, which we were informed was a dead letter, it never having been attempted to be used but once since the organization of the court and which then proved a failure. With these exceptions the powers of the supreme court have not been changed. This court has proved to be the strongest and best part of the mechanism of the Berlin treaty and we have felt it proper therefore to strengthen rather than to weaken its powers."

There is no reason to doubt that the question of jury trial was carefully considered by the Commandant who framed the Form of Government, and that he decided that it was impracticable to obtain a competent grand or petit jury; that in order to insure the "inalienable rights" of the people to justice, it was necessary to establish different forms of courts than those in the United States. The present form of administration of justice has stood the test of time.

The High Court did not err in its ruling that it had jurisdiction. See, also, *P. B. Gungan, U.S.N., on behalf of Island Government v. E. W. Gurr*, 1 A.S.R. 176 (1908),

(denying right to jury trial); *In re Chas. Risatake*, No. 150-1901, Dist. Court No. 1; *McMoor v. Jewett*, No. 142-1901 (Appealed).

The second and third grounds in the motion for a new trial, "The decision of the Court is not sustained by sufficient evidence" and "The decision of the Court is contrary to law" are considered together.

A careful review of the evidence and of the proceedings shows that the defendant, Mrs. L. J. Willis, did willfully and unlawfully and with force of arms make an assault upon the person of David Russell McDonald, with a blunt instrument, to wit a horse-whip, and did then and there with the intent to do bodily harm, strike out and bruise the said McDonald.

The questions at issue are: First, Was the offense committed without just cause or excuse? Second, Was there considerable provocation therefor? The defense maintains that from the evidence adduced these questions should be answered in the negative.

The evidence shows that on the afternoon of April 28, 1911, the defendant, in the office of the Governor of Tutuila, and Commandant of the Naval Station, heard complaining witness say certain things about her which made her very angry. It appears that these statements were made during a conversation held in the Governor's office, and while the complaining witness was there at the request of the Governor, and not of his own volition, during the forenoon. On that afternoon the defendant sought from the Governor information as to what aspersions had been cast upon her character in his office in the morning by the complaining witness, and the Governor sent for the complaining witness that he might be present to affirm or deny what was said in the conversation of the forenoon. The conversation was not of the complaining

witness's own seeking, and at the end of the conversation the Governor stated that it would not go beyond his office.

■ While I cannot agree with the High Court when it says: "The Court is unable to find in the evidence any truly serious allegations against the character of the defendant," I do not find any evidence to show that there was just cause for assault. Serious allegations against the character of the defendant, under such circumstances cannot constitute a just cause or excuse for an assault.

■ Provocation can only be set up in extenuation and is not a defense. When considering provocation it cannot be material as to what impression is produced upon the mind of the Court by certain words, the only question being as to the impression produced upon the mind of the person committing the assault. In the case at bar the evidence shows the impression produced upon the mind of the defendant by the statements of the complaining witness. In the instance cited by the Court, "The statement by Mr. McDonald that he 'saw the defendant come out of Dwyer's room at three o'clock in the morning,'" the effect on the mind of the defendant is shown by her declarations, "He is trying to make you believe I slept with Mr. Dwyer;" "He is a bad man."

■ It is further shown by the evidence that the defendant was excited during the conversation; that she used the words, "Liar." "He is lying." "He is a bad man.", in reference to the complaining witness, and that when she left the office she was excited.

The evidence shows that the defendant was enraged against the plaintiff, as a result of what was said by the complaining witness in the office of the Governor, about the defendant and her two girls ................................. and ...................; that she was still under the influence of this

rage when the assault was made, about forty-five minutes later.

It is believed the evidence shows that there was some provocation for the offense as charged. This provocation, however, does not constitute a complete defense. The words of the Complaint, "there being no considerable provocation therefor" are not material in a charge of assault and battery and, therefore, need not be proven.

It having been established that there was provocation and that the defendant was enraged because of this provocation, it is necessary to determine to what degree this mitigates the offense. This is a question for the Court to determine.

■ There is no Regulation in Tutuila fixing the maximum sentence for assault and battery, and the punishment for the offense of assault and battery is not specially provided for by any law of the United States. The United States Revised Statutes, Sec. 3391, provides:

"If any offense be committed in any place which has been or may hereafter be ceded to and under the jurisdiction of the United States which offense is not prohibited or the punishment thereof is not specially provided for by any law of the United States, such offense shall be liable to and receive the same punishment as the laws of the state in which such place is situated, now in force, provide for the like offense when committed within the jurisdiction of such state. And no subsequent repeal of any such state law shall affect any prosecution for such offense in any Court of the United States."

■ At the time the United States assumed the entire control of the Islands of Tutuila and Manua, they were being governed under the provisions of a treaty between England, Germany and the United States, extending back to 1889, the date of the treaty.

The treaty of 1889 provides among other things as follows:

"Article III, Section 10. The practice and procedure of Common Law, Equity and Admiralty, as administered in the Courts of England may be—as far as practicable—the practice and procedure of this court (Supreme Court); but the Court may modify such practice and procedure from time to time as shall be required by local circumstances. The Court shall have authority to impose, according to the crime, the punishment established therefor by the laws of the United States, of England, or of Germany, as the Chief Justice shall decide most appropriate; or, in the case of Native Samoans or other Natives of the South Sea Islands, according to the laws and customs of Samoa."

■ Article IV of the treaty between the United States of America and the Government of the Samoan Islands, proclaimed February 13, 1878, provides in part as follows: "Crimes and offenses in cases where citizens of the United States may be convicted shall be punished according to the laws of their country." But as hereinbefore stated I am unable to find any United States Statute defining and fixing the punishment for assault and battery.

In this connection it will be interesting to note a law enacted by Congress for the territory of Alaska. Section 25 of said act reads as follows:

"That whoever, not being armed with a dangerous weapon, unlawfully assaults or threatens another in a menacing manner, or unlawfully strikes or wounds another, shall be fined not more than five hundred dollars or imprisoned in the county jail not more than six months, or both." (2 Suppl. to Rev. Stats. U.S. p. 1006.)

The Penal Code for the State of California defines and fixes the punishment for assault, and for battery as follows:

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Sec. 240.)

"An Assault is punished by fine not exceeding five hundred dollars, or by imprisonment in the county jail not exceeding three months." (Sec. 241.)

"A battery is any willful and unlawful use of force or violence upon the person of another." (Sec. 242.)

651

"A battery is punishable by fine of not exceeding one thousand dollars, or by imprisonment in the county jail not exceeding six months, or by both." (Sec. 243.)

The penal codes of other states are not available, not being on this Station.

An examination of the cases of assault before the Courts of Tutuila, since 1904, shows that in no case of simple assault and battery has the punishment been greater than imprisonment for three months for first offense.

 The sentence of the Court in this case, being imprisonment for a period of six months, is therefore shown to be equal to the maximum punishment allowed in Alaska and California, and is twice that of the maximum punishment heretofore inflicted on any one in Tutuila, for like offense. I am of the opinion, however, that such sentence while very severe is not illegal, it being within the power of the court.

After having reviewed the proceedings of the Court and upon careful consideration of the questions raised by defendant's petition for review, I am of the opinion that the court did not err in overruling defendant's motion for a new trial and in arrest of judgment.

Judgment affirmed.